# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| LATONYA WILSON, | ) |
| PLAINTIFF, | ) |
| V. | ) |
| | ) Civil Action No.: _____ |
| EXTRA SPACE MANAGEMENT, INC. d/b/a EXTRA SPACE STORAGE | ) |
| | ) JURY TRIAL DEMANDED |
| DEFENDANT. | ) |

## COMPLAINT

Plaintiff Latonya Wilson ("Plaintiff" or "Ms. Wilson") respectfully submits the following Complaint:

## INTRODUCTION

1. Plaintiff is a former employee of Defendant Extra Space Management, Inc. d/b/a/ Extra Space Storage in Sandy Springs, Georgia. Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. as amended by the Civil Rights Act of 1991 ("Title VII") and state law claims of intentional infliction of emotional distress and punitive damages pursuant to O.C.G.A. § 51-12-5.1 to correct the unlawful employment practices alleged herein. Plaintiff seeks declaratory and injunctive relief, equitable relief, damages, and attorneys' fees and costs.

1

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over Plaintiff's Title VII claims under 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

3. This Court is a proper venue for Plaintiff's claims under 28 U.S.C. § 1391(b), because the unlawful conduct giving rise to the claims occurred in this District.

## THE PARTIES

4. Plaintiff is a resident of Sandy Springs, Georgia and submits herself to the jurisdiction of this Court.

5. Defendant Extra Space Management, Inc. d/b/a/ Extra Space Storage is a foreign profit corporation licensed to conduct business in the state of Georgia.

6. At all times relevant to this action, Defendant conducted business, maintained facilities, and derived substantial revenue in the State of Georgia and is subject to the jurisdiction and venue of this Court.

7. Defendant may be served with process by serving a copy of the Complaint and Summons on its registered agent, C T Corporation System, 289 S. Culver Street, Lawrenceville, GA 30046.

8. Defendant is an employer as defined by Title VII.

## CONDITIONS PRECEDENT

9. Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 6, 2020.

10. A Notice of Right to Sue was issued by the EEOC on December 10, 2021.

11. Plaintiff files this lawsuit within ninety (90) days of receiving the Notice of Right to Sue.

## FACTUAL ALLEGATIONS

12. Extra Space Storage is the second largest operator of self-storage facilities in the United States.

13. Extra Space Storage owns or operates over 1,800 stores throughout the United States and Puerto Rico, compromising approximately 1.3 million units and 135 million square feet of rentable space.

14. Defendant hired Ms. Wilson, a female, as an Assistant Store Manager on or about October 9, 2019.

15. Ms. Wilson was promoted to the position of Store Manager on or about February 2020 based on her strong performance.

16. As the Store Manager, Ms. Wilson worked at the Extra Space Storage located at 6780 Roswell Road, Suite A, Sandy Springs, GA 30328.

17. As the Store Manager, Ms. Wilson reported to District Manager Edward Solly.

18. For most of Ms. Wilson's tenure as Store Manager, Ms. Wilson was single covered. In other words, Ms. Wilson was the only employee working at that Extra Space Storage location.

19. Prior to Ms. Wilson becoming Store Manager (when Ms. Wilson worked as an Assistant Store Manager under a different Store Manager), the store was double covered.

20. The Extra Space Storage location where Ms. Wilson worked had four floors. Ms. Wilson's office was located on the first floor, which is where the main entrance was located.

21. All patrons had access to Ms. Wilson's office during business hours.

22. On July 12, 2020, a male by the name of Munir Doss—who had a storage unit on the third floor—came into Ms. Wilson's office with another gentleman who was deaf.

23. Mr. Doss approached Ms. Wilson's desk and began sexually harassing Ms. Wilson by making extremely vulgar and inappropriate comments. Specifically, Mr. Doss asked Ms. Wilson if she had a man and how many times she has had sex and then stated that he had sex last night, it was good, and that she should try it with him. Mr. Doss also told Ms. Wilson that she was a beautiful black woman that looked like Serena Williams. Mr. Doss was on the phone with another male and began describing Ms. Wilson's appearance to the male on the phone. The male stated, "Tell her I am going to be her new baby daddy."

24. Ms. Wilson, who was extremely disturbed by these comments and the presence of these two males in her office given that they did not appear to need any assistance with their storage unit, told them that they needed to leave her office.

25. When Ms. Wilson told Mr. Doss that he needed to leave her office, instead of leaving, Mr. Doss took out his gun clip, began counting bullets, and then was putting the bullets back in the clip as if to intimate Ms. Wilson into having sexual relations with him.

26. Mr. Doss then asked Ms. Wilson, "Do you want to see something cool?!"

27. As the camera footage of the office reveals—Mr. Doss then spread his legs and did a shooting motion as if to signal that he was planning on shooting Ms. Wilson.

28. The gentleman with Mr. Doss shook his finger as if to signal that Mr. Doss should not shoot her.

29. However, after making the shooting gesture, Mr. Doss left the office.

30. Upon information and belief, Mr. Doss went to retrieve his gun to shoot Ms. Wilson.

31. At that point, Ms. Wilson was justifiably terrified for her life and immediately called District Team Leader Gerard Vega.

32. Mr. Vega told Ms. Wilson to leave the office but did not tell Ms. Wilson to call the police. Ms. Wilson, who was fearful for her life, told the gentleman that had come with Mr. Doss that he needed to leave the office. Ms. Wilson then locked the office door and hid behind her desk.

33. When both Mr. Doss and the other gentlemen were out of sight (she could no longer see them through the window), she went on the elevator to the fourth floor and called the police.

34. Mr. Doss did not have access to the fourth floor because his unit was on the third floor and patrons only have access to the first floor and the level on which their unit is located.

35. Notably, the second and third floors do not have cameras on those floors.

36. Ms. Wilson was terrified for her life and as the video camera footage demonstrates—she was pacing back and forth very nervously while talking to the police on the telephone—as she was scared that Mr. Doss would find her and kill her.

37. In fact, the camera footage demonstrates that Mr. Doss went back to the office looking for Ms. Wilson, but he was not able to find her because she was on the fourth floor.

38. When the police arrived, they instructed Ms. Wilson to go to her office and to lock the doors and not come out until they told her she could come out.

39. The police spoke to Mr. Doss but did not arrest him because they were not able to locate a gun on his person, instead they only saw the clip and bullets. The police asked Mr. Doss to leave the property.

40. Although the police were not able to locate Mr. Doss' gun, Mr. Doss did have a gun on the property as a review of Defendant's camera footage demonstrates.

41. As the camera footage demonstrates, the gentleman that was in Ms. Wilson's office with Mr. Doss hid the gun behind a wooden board prior to the police arriving.

42. The camera footage shows Mr. Doss recovering his gun from behind the wooden board while the police officers were in the office talking to Ms. Wilson.

43. Following this incident, Ms. Wilson—who was fearful for her life—requested that leadership take action to ensure that Mr. Doss would never sexually harass her again or worse, kill her.

44. The only action the Company did to investigate and address the issue was to call Mr. Solly on July 15, 2020. During that conversation, Mr. Doss told Mr. Solly that he should tell Ms. Wilson "do what the hell I say or find another god damn job." Mr. Solly told Mr. Doss that he did not speak to his employees that way. Mr. Doss also demanded that Mr. Solly tell him why Ms. Wilson had called the police and stated he wanted a formal apology and if he did not receive one, he would be suing the Company. Mr. Solly told Mr. Doss that he would have to speak with the Company's legal department and that he could no longer speak to him.

45. Shockingly—even though a patron that owned a storage unit had come to the property and sexually harassed Ms. Wilson and was presumably going to shoot her— no one from leadership came to the property to speak with Ms. Wilson, ask how they could address the issue, review camera footage, or prohibit Mr. Doss from coming back on the property.

46. The Company could have gotten security, installed some sort of device on the door so that Ms. Wilson could beep in patrons to the office, or gotten another employee to work at the location so that Ms. Wilson would not be single covered.

47. However, the Company did nothing aside from call Mr. Doss.

48. When Ms. Wilson asked Mr. Solly if she could lock the door in case Mr. Doss returned, Mr. Solly told her that she could not lock the door.

49. Ms. Wilson came to work every single day fearful for her life.

50. When Ms. Wilson would follow up with Mr. Solly about what the Company was planning on doing about Mr. Doss, Mr. Solly would say he was waiting on Human Resources to make a decision.

51. However Human Resources did nothing and—not surprisingly—on August 3, 2020, Mr. Doss returned to the property looking for Ms. Wilson.

52. Specifically, Mr. Doss went to Ms. Wilson's office and began aggressively beating on the window and pulling at the door trying to open it, however, Ms. Wilson kept the door locked (despite being told not to) for fear that Mr. Doss would kill her.

53. Ms. Wilson told Mr. Doss to call her and when he called her he said that he needed to pay his bill. Ms. Wilson looked in the computer system and noticed that Mr. Doss' bill was not due until September 1, 2020.

54. Shortly thereafter, another gentleman came to the door asking for some water. When Ms. Wilson let him into the office, he started asking her personal questions such as asking her how many times she had been married and her age.

55. After the gentleman left Ms. Wilson's office, Ms. Wilson saw the gentleman go down the breezeway and into an elevator with Mr. Doss.

56. Upon information and belief, Mr. Doss and this gentleman had come to the property together.

57. Ms. Wilson was, understandably, extremely disturbed and fearful after Mr. Doss had tried coming to her office a second time.

58. Ms. Wilson called Gwen Baker in Human Resources at 4:27PM that day and left her a voicemail explaining that Mr. Doss was on the property and again reiterating how fearful she was for her life and requesting that the Company take action to ensure that this gentleman did not come back to the property again.

59. Despite Ms. Wilson's plea that the Company step up and take some action, the Company did nothing.

60. Ms. Wilson left Ms. Baker another voicemail on August 6, 2020 regarding Mr. Doss and requesting the that the Company take some action, but again, the Company did nothing.

61. On or about September 18, 2020—two months after Mr. Doss first sexually harassed Ms. Wilson and threatened to kill her—Mr. Doss came onto the property a third time.

62. At the time Mr. Doss came onto the property, Ms. Wilson was not in her office. As the Store Manager, Ms. Wilson got notifications on her computer through Store Logic when patrons came on and off the property. Ms. Wilson received a notification on her computer when Mr. Doss had exited the property, however, given that she had not been in her office, she did not see that Mr. Doss was on the property in the first place.

63. Upon information and belief, Mr. Doss came on the property on September 18, 2020 looking for Ms. Wilson but was unable to find her given that she was not in her office.

64. On September 18, 2020, Ms. Wilson—who at this point was desperate as this was the third time Mr. Doss had been on the property with no action by the Company whatsoever (aside from a short phone call to Mr. Doss)—called Ms. Baker again and requested that action be taken.

65. At the end of September 2020 rather than tell Mr. Doss he was no longer allowed on the property, strategize with Ms. Wilson regarding ways in which to prevent this type of incident again, or protect her safety, the Company told Ms. Wilson that she could transfer to another Extra Space Storage location—a location that was 30 minutes away from where she lived.

66. On October 5, 2020, Ms. Wilson told Ms. Baker that she was walking on eggshells working at the property. Ms. Wilson said that as a Store Manager, she had been told that she needed to be on the property cleaning and attending to other matters but if she was not in her office, she would not be able to tell if Mr. Doss was on the property. Ms. Wilson further told Ms. Baker that there were no cameras on the third floor, the floor where Mr. Doss' unit was located. Ms. Wilson explained that it made no sense that Extra Space Storage valued Mr. Doss as a customer more than they cared about her safety and that rather than not allow him back on the property, they were moving her. Ms. Baker responded that Ms. Wilson had a decision she needed to be make—she could either transfer or resign her employment.

67. Following that conversation, despite the fact that Ms. Wilson desperately needed her employment at Extra Space Storage as she is a single parent with two kids in college and the only bread winner in her family, Ms. Wilson had no option but to resign her employment as her life was in jeopardy.

9

68. Ms. Wilson was constructively discharged from her employment at Defendant.

69. Ms. Wilson was living in fear on a daily basis that Mr. Doss would come to the property and kill her, and the Company had no regard for her safety whatsoever.

## COUNT I
### Sexual Harassment in Violation of Title VII

70. Plaintiff incorporates by reference all preceding paragraphs of the Complaint.

71. An employer may be found liable under Title VII for the harassing conduct of its customers if the employer fails to take immediate and appropriate action in response to a hostile work environment of which the employer knew or reasonably should have known.

72. Plaintiff was subjected to a hostile work environment that was severe and pervasive, for which Defendant is liable.

73. Defendant violated Plaintiff's rights under Title VII by, among other things, failing to take immediate and appropriate action in response to a hostile work environment of which the employer knew.

74. Defendant violated Plaintiff's rights under Title VII by, among other things, failing to prevent her from being subjected to unwelcomed sexual comments, solicitations, and assault and failing to take reasonable preventative or corrective measures with respect to the unlawful conduct.

75. Defendant's conduct in failing to address the sexual harassment that Plaintiff was experiencing forced her into an involuntary resignation.  A reasonable person in Plaintiff's position would have felt compelled to do the same.  Plaintiff's working conditions were so intolerable that she was forced to resign.  Therefore, Plaintiff was constructively discharged from her position.

76. As a direct and proximate cause of Defendant's actions, Plaintiff has suffered damages including emotional distress, inconvenience, loss of income and benefits, out of pocket expenses, attorney's fees and costs, humiliation, and other indignities.

77. Defendant undertook its actions intentionally and maliciously with respect to Plaintiff and her federally protected rights, and undertook its conduct recklessly with respect to Plaintiff and her federally protected rights, entitling her to recover compensatory and punitive damages against it.

## COUNT II
### Intentional Infliction of Emotional Distress

78. Plaintiff incorporates by reference all preceding paragraphs of the Complaint.

79. Plaintiff was sexually harassed by a male patron of Extra Space Storage who had a gun and appeared to want to kill her.

80. Despite Plaintiff's constant pleas for Defendant to take action to address the situation, they took no action to address the situation.

81. The male patron, Mr. Doss, came on the property two more times after the initial act of sexual harassment and assault.

82. Ms. Wilson was living in fear on a daily basis that Mr. Doss would come to the property and kill her, and the Company had no regard for her safety whatsoever.

83. As a direct and proximate cause of Defendant's actions in refusing to address the situation which caused Mr. Doss to come on the property two more times after the initial of act of sexual harassment and assault, Plaintiff has suffered damages in an amount to be proven at trial.

84. An employer is liable for the intentional infliction of emotional distress of an employee when the employer commits and adverse and intentional act toward the employee that

11

is outrageous and beyond simple disciplinary authority. Further, the employer's outrageous conduct must be so egregious as to shock the conscience of an ordinary individual.

85.     Defendant's actions demonstrate willful misconduct, malice, wantonness, oppression and want of caring raising the presumption of conscious indifference to the consequences of its actions, entitling Plaintiff to punitive damages.

## COUNT III
### Punitive Damages O.C.G.A. § 51-12-5.1

86.     Plaintiff incorporates by reference all preceding paragraphs of the Complaint.

87.     Defendant's above-pled actions were willful, malicious, wanton and/or oppressive within the meaning of O.C.G.A. § 51-12-5.1(b).

88.     Additionally, and in the alternative, Defendant's actions display, within the meaning of that statute, an entire want of care indicative of a conscious indifference to its actions' consequences.

**WHEREFORE,** Plaintiff demands a TRIAL BY JURY and the following relief:

(a) declare that Defendant has violated Plaintiff's rights under the federal statute and state laws listed above;

(b) permanently enjoin Defendant from violating, in the future, Plaintiff's rights under the federal statute and state laws listed above;

(c) award Plaintiff full back pay, including all lost pay and benefits, raises, cost of living increases, retirement benefits, and all other lost benefits and compensation reducible to a dollar amount;

(d) award Plaintiff prejudgment interest as required by law;

(e) award Plaintiff compensatory damages for emotional pain and suffering in an amount to be determined by the enlightened conscience of a jury;

(f) award Plaintiff front pay, including all lost future pay and benefits, raises, cost of living increases, retirement benefits, and all other lost benefits and compensation reducible to a dollar amount;

(g) award Plaintiff punitive damages, against Defendant sufficient to punish it for its unlawful conduct and deter it from repeating such conduct in the future, as determined by the enlightened conscience of a jury;

(h) award Plaintiff reasonable attorneys' fees and expenses; and

(i) grant such additional relief as may be just.

Respectfully submitted, this 27th day of December, 2021.

*s/ Jackie Lee*
Jackie Lee
Georgia Bar No. 419196
LEE LAW FIRM, LLC
1100 Peachtree Street NE, Suite 250
Atlanta, Georgia 30309
Telephone: (404) 301-8973
jackie@leelawga.com

**COUNSEL FOR PLAINTIFF**